IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>$151,383.00 UNITED STATES CURRENCY,<br><br>　　　　　　　　Defendant. | Civil No. 8:22CV368<br><br>**COMPLAINT FOR FORFEITURE *IN REM*** |

　　　　The United States of America, for its cause of action against the defendant property, pursuant to Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, states and alleges as follows:

### Nature of the Action

1.　　This is an action to forfeit property to the United States for violations of 21 U.S.C. § 881.

### The Defendant *in rem*

2.　　Defendant property is $151,383.00 U.S. currency seized by law enforcement from a rented vehicle during a traffic stop on westbound Interstate 80, in Omaha, Nebraska, near the 60th Street exit on May 21, 2022. The vehicle was operated by Brian Anthony Moran (Moran) and the passenger was identified as Ismail Mohamed Tawfik Fadhl (Fadhl).

3.　　The U.S. Marshals Service, currently has custody of the defendant property in Omaha, Nebraska.

### Jurisdiction and Venue

4.　　This Court has subject matter jurisdiction for an action commenced by the United States pursuant to 28 U.S.C. § 1345, and for an action for forfeiture pursuant to 28 U.S.C.

§ 1355(a). This Court also has jurisdiction over this particular action pursuant to 21 U.S.C. § 881.

5. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

## Basis for the Forfeiture

7. Defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act, 2) proceeds traceable to such an exchange, and/or 3) money, negotiable instruments and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## Facts

8. On Saturday, May 21, 2022, at 8:00 a.m., Douglas County Sheriff's Office's (DCSO) Deputy J. Bargstadt was westbound on Interstate 80 near 42nd street. He observed a white Chevy Malibu in front of his cruiser failing to maintain its lane. The Malibu crossed over the white dotted line in the second lane on the curve near 42nd street. The passenger side wheels of the Malibu crossed over the lane divider three feet to the right and then corrected its path of travel back into the second lane. Deputy Bargstadt

conducted a traffic stop of the Malibu near 60th street on westbound Interstate 80. The Malibu bore Florida license plate 15BKAW.

9. Deputy Bargstadt made contact with the driver, identified by his New York state driver's license as Brian Moran (Moran). He was advised of the violation for failure to maintain his lane. Moran advised he had been driving through the night. A passenger in the backseat whom had been previously sleeping provided a rental contract for the Malibu. The passenger identified himself with a New York state driver's license. He was identified as Tawfik Ismail Mohamed Fadhl (Fadhl). The rental contract showed Fadhl to be the renter of the vehicle. He had rented the Malibu less than a day earlier in Buffalo, New York on May 20, 2022. The vehicle was to be returned in Los Angeles, California, on May 24, 2022.

10. The driver, Moran, was asked to come back to Deputy Bargstadt's cruiser while record checks could be completed. Moran sat in the front passenger seat of the cruiser. While Deputy Bargstadt began paperwork and checks, he asked Moran about their reasons for travel. Moran stated himself and the passenger were currently driving to Las Vegas, Nevada for a glass sculpture show. Deputy Bargstadt asked Moran when the show was. Moran replied they would be going to the show Sunday, in less than 24 hours. Moran called the show "Glass Vegas" explaining it was a large yearly event for people in the glass blowing industry. Moran stated his passenger Fadhl was in the industry and he worked for him in Buffalo, New York.

11. Deputy Bargstadt pulled up "Glass Vegas" on his computer to verify Moran's travel plans. The website for "Glass Vegas" did not list a date for any upcoming events in

2022. The website for the "Glass Vegas" show had very limited information. It was determined "Glass Vegas" for 2022 had already occurred in February of 2022.

12. While looking over the rental agreement for the Malibu, Deputy Bargstadt noticed the vehicle was scheduled to be returned in Los Angeles, California, at LAX airport on May 24, 2022. Deputy Bargstadt asked Moran how they planned to get back to Buffalo, New York. Moran stated they would fly back. Deputy Bargstadt asked why they didn't fly out to the show. Moran stated they wanted to save money by driving a rental car, that way they could afford plane tickets to fly home.

13. While waiting for record checks to be completed, Deputy Bargstadt went back to the rental car to speak with Fadhl. Fadhl was handed back the rental papers. Deputy Bargstadt asked about the reason for them travelling. Fadhl said they were going to "Glass Vegas" the next day to see some glass sculptures. Deputy Bargstadt asked about the rental car return location being in Los Angeles. Fadhl stated after viewing "Glass Vegas" they would drive to Los Angeles to see some of his friends. While speaking with Fadhl, Deputy Bargstadt noticed him to be extremely nervous. His body was visibly shaking. Nervous tremors could be seen in his hands and arms.

14. Deputy Bargstadt suspected criminal activity based on the "Glass Vegas" convention had already taken place, the short-term rental car being driven across the country, the future purchase of airline tickets to get back home, and Fadhl's extreme nervousness. In Deputy Bargstadt's training and experience the innocent motoring public doesn't take trips in the manner Fadhl and Moran were currently doing.

15. Deputy Bargstadt asked Fadhl about any illegal items or drugs in the vehicle. Fadhl said no. Deputy Bargstadt asked about large amounts of money in the vehicle. Fadhl said no. Deputy Bargstadt clarified if there was anything more than ten thousand dollars in the vehicle. Fadhl stated he had $10,000.00 in the vehicle, but no more than $10,000.00. Deputy Bargstadt asked where the $10,000.00 was. Fadhl said it was in the gym bag sitting beside him on the backseat. Deputy Bargstadt asked Fadhl for consent to search the vehicle. Fadhl stated he couldn't allow that.

16. Sergeant Eric Olson was called to assist Deputy Bargstadt at the traffic stop location. Deputy Bargstadt asked Sergeant Olson to deploy his narcotics certified K-9 around the exterior of Fadhl's rental vehicle. Sergeant Olson's K-9 sniffed the exterior of the vehicle and he received an indication from the K-9. Fadhl was placed in Sergeant Olson's cruiser by Deputy Bargstadt. Prior to placing him in the front seat of the cruiser, Deputy Bargstadt asked Fadhl if there was anything more than $10,000.00 in the rental vehicle. He clarified there was not.

17. Deputy Bargstadt, Deputy James Benes, and Sergeant Olson searched the interior of the Malibu. Deputy Bargstadt located the grey and black gym bag in the back seat which was claimed earlier by Fadhl. Deputy Bargstadt located U.S. currency in a black plastic bag within the gym bag. The currency was rubber banded in six separate bundles. Deputy Bargstadt believed there was more than $10,000.00 in the six bundles of currency. Sergeant Olson was searching the trunk while Deputy Bargstadt was in the backseat area. Sergeant Olson had lifted up the spare tire access door inside of the trunk. Inside the spare tire Sergeant Olson located a black plastic bag containing currency.

Inside the black plastic bag Sergeant Olson located a food saver heat sealed bundle containing numerous bundles of U.S. currency. Sergeant Olson showed the bundle to Deputy Bargstadt. It was observed to contain numerous bundles with small notes showing a currency count of each bundle. Three bundles had hand written notes displaying 20,000 on them. One bundle had 25,000 written on it. Another bundle of money had nothing attached to it.

18. Deputy Bargstadt called for Young's Towing in order to impound the Malibu for further investigation. The currency was placed back into the vehicle where it was originally located. Young's Towing relocated the Malibu to the DCSO K-9 office. A crime scene Investigator took photographs of the vehicle and its interior.

19. A currency sniff was conducted by Sergeant Olson's K-9. The K-9 indicated to a drug odor coming from the suspect currency.

20. Moran and Fadhl were transported to the DCSO K-9 office. Fadhl stated roadside the money in the gym bag and the money in the trunk were legitimately his. At DCSO, Fadhl was read his Miranda rights. Fadhl invoked his rights and wanted an attorney present. Moran was also read his Miranda rights and indicated he wanted an attorney. At approximately 12:00 p.m. Fadhl and Moran left DCSO in their rental car. Deputies seized the suspect currency along with electronic devices in the vehicle prior to their departure.

21. A count of the money at the DCSO property was conducted. The gym bag money totaled $46,283.00. The heat-sealed food saver bundles totaled $105,100.00. The total was $151,383.00. The money was placed into property until the bank count.

22. The money was transferred and counted at the Omaha Police Department Federal Credit Union and a cashier's check was issued for the total amount of $151,383.00.

### Claim for Relief

WHEREFORE the United States of America prays the defendant property be proceeded against for forfeiture in accordance with the laws, regulations and rules of this Court; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the defendant property be condemned, as forfeited, to the United States of America and disposed of according to law and regulations; that the costs of this action be assessed against the defendant property; and for such other and further relief as this Court may deem just and equitable.

UNITED STATES OF AMERICA,
Plaintiff

STEVEN A. RUSSELL
Acting United States Attorney

By: s/ Kimberly C. Bunjer
KIMBERLY C. BUNJER, #20962
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE 68102-1506
Tel: (402) 661-3700
Fax: (402) 345-5724
E-mail: kim.bunjer@usdoj.gov

## VERIFICATION

I, Task Force Officer **Joshua Echtinaw**, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the United States Drug Enforcement Administration, that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs 8 through 22 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Task Force Officer of the DEA.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: October 24, 2022

**Joshua D Echtinaw**
Task Force Officer
Drug Enforcement Administration, TFO